

**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 22nd day of November, 2021.**

Robert D. Berger
United States Bankruptcy Judge

---

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

**KENT LINDEMUTH**,

|  |  |
|---|---|
| Debtor. | Case No. 12-23060<br>Chapter 11 |

---

**KENT LINDEMUTH**,                     Adv. No. 21-6001

Plaintiff,

v.

**LLOYD & MacLAUGHLIN LLC**, et al.,

Defendants.

---

## BANKRUPTCY COURT'S RECOMMENDATION UNDER
## D. KAN. RULE 83.8.6 THAT THE DISTRICT COURT DENY PLAINTIFF'S
## <u>MOTION TO WITHDRAW THE REFERENCE</u>

Plaintiff Kent Lindemuth moves to withdraw the reference from, and transfer this adversary proceeding to, the district court under 28 U.S.C. § 157(d) and D. Kan. Rule 83.8.6.  This order serves as the recommendation of the bankruptcy court under D. Kan. Rule 83.8.6(c).  The bankruptcy court recommends that the district court deny the motion at this time because (1) the plaintiff has not met his burden of establishing "cause" under § 157(d) to withdraw the reference and (2) even if such cause exists, withdrawal need not occur until this proceeding is ready for trial.

I.    **Background**

Kent Lindemuth, his late wife Vikki, and five of their companies[1] (together with Kent and Vikki, "**Debtors**") filed Chapter 11 bankruptcy petitions in 2012.  The debtor companies owned a number of commercial real estate properties, mostly in Topeka; the properties served as collateral for tens of millions of dollars in loans.

Soon after the petitions were filed, Debtors' secured lenders began to complain that Kent was mismanaging the mortgaged properties and not cooperating with the lenders in bankruptcy-related matters.  According to Debtors' current attorney-in-fact, defendant Jim Lloyd:

> In or around early 2013, several of the lenders to the Debtor Companies began to express to Chapter 11 counsel their frustration and complete lack of confidence in Mr. Lindemuth due to his persistent actions in blocking and/or attempting to block several proposed sales of the real property securing their loans and Mr. Lindemuth's general mismanagement of the subject properties.  The lenders did not want Mr. Lindemuth to be a debtor-in-

---

[1] The five "**Debtor Companies**" are Lindemuth, Inc.; Lindy's, Inc.; KDL, Inc.; Bellairre Shopping Center, Inc.; and K. Douglas, Inc.; Debtors' bankruptcy cases were jointly administered under case number 12-23055 (Lindemuth, Inc.).

possession and have control of the Debtors' assets.  He
was constantly attempting to block the Chapter 11
Debtors' efforts to develop and implement a plan of
reorganization.[2]

Debtors filed proposed Chapter 11 plans (the "**Joint Plans**") in 2014.[3]  To

obtain their secured lenders' acceptance of the Joint Plans, and as a precondition to

confirmation of the Joint Plans,[4] Kent and Vikki entered into an agreement

appointing defendant Jim Lloyd as Debtors' attorney-in-fact (the "**Power of**

**Attorney**").  The Power of Attorney authorizes Lloyd, among other things:

> 1.    To administer and preserve all assets of the
>       Bankruptcy Estates.
>
> 2.    To exercise authority and control of the financial
>       affairs, including but not limited to real properties,
>       owned by Kent, Vikki or any entities owned by
>       Kent and Vikki, with the express goal and direction
>       to maximize the value of the entire bankruptcy
>       estate.
>
> 3.    To draft, negotiate and implement a plan of
>       reorganization in the consolidated bankruptcy
>       cases. [and]
>
> 4.    To sell, lease, transfer or exchange any of Debtors'
>       real or personal property as the above mentioned
>       attorney-in-fact considers correct at reasonable

---

[2] ECF 55 at 2-3.

[3] *See* Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code (No Substantive Consolidation) (March 14, 2014), Case No.
12-23055, ECF 443.

[4] *See infra* pp. 10-11 (describing agreement with secured lenders); *cf.* 11 U.S.C.
§ 1124 ("Impairment of claims or interests"); 11 U.S.C. § 1126 ("Acceptance of
plan"); 11 U.S.C. § 1129 ("Confirmation of plan").

> prices and with other terms and conditions that
> may be required.[5]

The Power of Attorney also provides:

> [Kent and Vikki] hereby give Lloyd *full, exclusive
> authority* to perform every necessary and proper act as
> fully as I could if I was personally present and during the
> pendency of this power of attorney Lloyd's rights *shall be
> exclusive and shall supersede and divest* Us of the above
> described powers.  The rights, power and authority to
> Lloyd that I now grant shall become effective as soon as I
> sign below and *shall not terminate until further
> Bankruptcy Court order terminating this instrument.*[6]

The bankruptcy court entered an order confirming Lloyd's authority under
the Power of Attorney on May 6, 2014 (the "**Bankruptcy Court Order**").[7]  The
Joint Plans were confirmed early the following year.[8]  Upon confirmation of the
Joint Plans, the Debtor Companies received a discharge, but Kent and Vikki
individually did not.[9]  Article XII of the Joint Plans, "Retention of Jurisdiction,"
provides:

> The Bankruptcy Court shall have the *exclusive
> jurisdiction of all matters arising out of, or related to,
> these Chapter 11 Cases and the Plans*, pursuant to, and

---

[5] ECF 1-1.

[6] *Id.* (emphases added).

[7] ECF 1-3.

[8] Confirmation Order, Case No. 12-23055, ECF 652; Joint Plans, Case No. 12-23055, ECF 443.

[9] *See* Joint Plans §§ 11.04-.05 (providing for discharge "to the fullest extent permitted by section 1141 of the Bankruptcy Code").  With exceptions not relevant here, an individual Chapter 11 debtor does not receive a discharge until one is granted by the bankruptcy court "on completion of all payments under the plan." *See* 11 U.S.C. § 1141(d)(5)(A).  In contrast, a non-individual Chapter 11 debtor typically receives a discharge at plan confirmation.  *See* 11 U.S.C. § 1141(d)(1)(A).

for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to:

. . .

(f) Hear and determine any disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plans, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

. . .

(m) Determine or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters and grant or deny any applications and motions involving the Debtors that may be pending in the Bankruptcy Court on or initiated after the Confirmation Date;

. . .

(s) Hear and resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, implementation, enforcement or interpretation of the Plans, whether by the Debtors, the Reorganized Debtors, or otherwise, or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Joint First Amended Plan or any entity's rights arising from or obligations incurred in connection with the Joint First Amended Plan or such documents;

. . .

(u) Issue injunctions, enter and implement such other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plans or the Confirmation Order;

. . .

(y) Determine all questions and disputes regarding title to the assets of the Debtors, the estates, or the Reorganized Debtors;

. . . [and]

(aa) Determine any other matters that may arise in connection with or relate to the Joint Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Joint Plan, the Disclosure Statement, or the Confirmation Order.[10]

The Joint Plans also state—31 separate times—that Debtors "shall continue to utilize Jim Lloyd as a financial advisor," and that the Debtors will "make Jim Lloyd available" to creditors "for consultation" and "to enable [the creditors] to monitor [Debtors'] compliance with the Plan."[11]

Debtors' bankruptcy cases were administratively closed at the end of 2015.[12]

In his motion to dismiss Kent's claims against him in this proceeding, Lloyd reports:

Pursuant to Mr. Lloyd's authority and in implementation of the confirmed Chapter 11 Plan, Mr. Lloyd has sold a total of approximately $40 million in real property out of an initial portfolio valued by the applicable County authorities at approximately $61 million. Throughout Mr. Lloyd's appointment as attorney-in-fact and as agent of the Debtors, he has had the full support of the secured lenders holding mortgages on the Debtors' assets securing their loans.[13]

---

[10] Joint Plans art. XII (emphasis added).

[11] Joint Plans §§ 5.01(e), 5.03(h), 5.04(h), 5.06(g), 5.07(h), 5.08(h), 5.10(e), 5.12(h), 5.13(h), 5.17(e), 5.18(h), 5.19(h), 5.24(h), 5.27(h), 5.28(g), 5.29(h), 5.30(h), 5.31(h), 5.32(h), 5.34(g), 5.36(h), 5.37(h), 5.42(h), 5.43(h), 5.46(h), 5.50(e), 5.51(h), 5.52(h), 5.53(g), 5.55(h), 5.57(h).

[12] *See* Final Decree, Case No. 12-23055, ECF 690.

[13] ECF 54 at 8.

On June 1, 2016, Kent was indicted on 103 counts of bankruptcy fraud arising out of his omission of 103 firearms from his Chapter 11 bankruptcy schedules and monthly operating reports.[14]  Superseding indictments charged him with additional counts of bankruptcy fraud as well as money laundering, perjury, and receipt of firearms and ammunition while under indictment.[15]

Vikki filed for divorce from Kent in Shawnee County, Kansas, on September 7, 2016.  The Shawnee County court entered an order at the outset of the case providing, among other things, that (1) "neither party shall change the beneficiary of any benefits or assets during the pendency of this action except as authorized by the [Joint Plans]" and that (2) Lloyd continued to have the powers granted to him under the Power of Attorney (the "**Divorce Court Order**").[16]  As to Lloyd, the order—which was prepared and approved by Kent and Vikki's divorce counsel—also states that "[i]t is integral to the completion of the Plan and the preservation of the assets that Jim Lloyd continue to manage and have the powers granted to him in the [P]ower of [A]ttorney and the [Bankruptcy Court] Order."[17]

---

[14] Indictment, *United States v. Lindemuth*, No. 16-cr-40047-DDC (D. Kan. June 1, 2016), ECF 1.

[15] First Superseding Indictment, *United States v. Lindemuth*, No. 16-cr-40047-DDC (D. Kan. Dec. 14, 2016), ECF 32; Second Superseding Indictment, *United States v. Lindemuth*, No. 16-cr-40047-DDC (D. Kan. Apr. 5, 2017), ECF 56; Third Superseding Indictment, *United States v. Lindemuth*, No. 16-cr-40047-DDC (D. Kan. May 3, 2017), ECF 71.

[16] ECF 1-4.

[17] *Id.* ¶ 8.

On March 10, 2017, the United States Trustee moved to reopen the Lindemuths' individual bankruptcy case under 11 U.S.C. § 350(b),[18] alleging that Kent owned 2,166 undisclosed firearms (including the 103 for which he was originally indicted). The bankruptcy court reopened the case that same day.[19]

On April 24, 2017, in connection with their divorce, the Lindemuths entered into an agreement that appointed Lloyd's firm, defendant Lloyd & MacLaughlin ("**L&M**"), as agent for themselves and three of the five Debtor Companies (the "**Agent Agreement**").[20] The Agent Agreement provides that "the Services to be performed by [L&M] pursuant to this Agreement include but are not limited to duties and functions to be performed by Lloyd pursuant to the [Power of Attorney]"; it further authorizes L&M:

> [i]n general to administer, protect and preserve all marital or other joint assets of the Lindemuths or their marital estate that are directly or indirectly owned or controlled by any of the Lindemuth Entities,[21] including but not limited to real and personal property assets of the Lindemuth Entities, and to exercise authority and control of the related financial affairs of the Lindemuth Entities,

---

[18] *See* U.S. Trustee's Mot. to Reopen, Case No. 12-23060, ECF 47. Section 350(b) provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."

[19] *See* Order Granting U.S. Trustee's Mot. to Reopen, Case No. 12-23060, ECF 48.

[20] ECF 1-5.

[21] The Agent Agreement defines "Lindemuth Entities" as KDL, Inc.; Lindemuth, Inc.; Lindy's, Inc.; and "[a]ny other additional legal entities as may be mutually agreed in writing from time to time by the Lindemuths and the Agent." *See* ECF 1-5 at 14 (Schedule 1).

with the express goal and direction of maximizing value of these assets.[22]

As to termination, the Agent Agreement provides that the Lindemuths' "authority to terminate this Agreement . . . shall be subject to obtaining any approvals of the Court as may be required."[23]

Vikki's individual bankruptcy case was deconsolidated from Kent's on May 1, 2017.[24]

On June 22, 2017, the bankruptcy court ordered the appointment of a Chapter 11 trustee in Kent's individual case.[25]  Four months later, the Chapter 11 trustee, Bruce Strauss, filed a motion for turnover requesting that Kent be ordered to turn over five unregistered, untitled, and uninsured vehicles that were found on Kent's property following a report of a break-in.[26]  Kent responded that the vehicles were owned by Lindy's Auto Sales, a non-debtor.[27]

---

[22] ECF 1-5 at 16 (Schedule 2).

[23] *Id.* § 8.4.

[24] *See* Order Granting Mot. to Sever Joint Case, Case No. 12-23060, ECF 66.

[25] *See* Courtroom Minute Sheet, Case No. 12-23060, ECF 75; Order on Appt. of Ch. 11 Trustee, Case No. 12-23060, ECF 76.

[26] *See* Trustee's Mot. for Turnover, Case No. 12-23060, ECF 139.

[27] *See* Resp. & Obj. to Trustee's Mot. for Turnover, Case No. 12-23060, ECF 163.

On December 8, 2017, a jury acquitted Kent of all bankruptcy-related charges.[28]  He was acquitted on the remaining charge—willful receipt of firearms while under indictment—following a bench trial in 2018.[29]

At the February 15, 2018 hearing on Strauss's motion for turnover, the bankruptcy court ordered Kent to turn over all documents in his possession regarding his acquisition of the vehicles at issue.[30]  The court also directed Kent to cooperate with Lloyd in preparing sworn, accurate balance sheets and cash flow statements for each of the debtors.  At that hearing, Kent's counsel acknowledged Kent's agreement with the secured lenders regarding Lloyd's authority over the Debtor Companies:

> [T]hey made a deal, they made an agreement.  And in order—and in return for Mr. Lindemuth giving his agreement to give Mr. Lloyd a—a complete irrevocable power of attorney that gave him complete control over all the real estate, Mr. Lindemuth got to keep those non-real estate businesses.  That was the deal.  And that's what Mr. Deines' affidavit says and that's what his testimony

---

[28] *See* Verdict, *United States v. Lindemuth*, No. 16-40047-01-DDC (D. Kan. Dec. 2, 2017), ECF 139.

[29] *See* Special Verdict, *United States v. Lindemuth*, No. 16-40047-01-DDC (D. Kan. Aug. 2, 2018), ECF 187.  Kent was charged with violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D) for willful "receipt" of two firearms while under felony indictment.  *See id.* at 9.  The government proved that while under indictment for bankruptcy fraud, Kent attended an auction with one Ledford, to whom he gave cash and asked "to bid on and, as the winning bidder, purchase the two guns at issue." *Id.* at 15.  Kent then directed Ledford to deliver the guns to Ledford's in-laws. *See id.* at 16.  The court reasoned that although Kent had "[c]learly . . . engaged in some sort of subterfuge at the auction," *id.* at 17, the government had not proved that Kent "received" the guns under the meaning of § 922(n). *See id.* at 15-16 (reasoning that § 922(n) "does not criminalize ownership interests that do not result in receipt").

[30] *See* Order, Case No. 12-23060, ECF 188.

at trial was.  And that's the fundamental reason why the
government's [criminal] case failed at trial.[31]

The "Deines affidavit" cited by Kent's counsel—from Jeffrey Deines, Kent's former

bankruptcy counsel—explains that Kent executed the Power of Attorney in

exchange for the secured lenders' consent to confirmation of the Joint Plans:

> In connection with seeking confirmation of the plan, the
> creditors wanted, among other things, Debtor to execute
> an irrevocable power-of-attorney in favor of Jim Lloyd. . . .
> In return for Jim Lloyd having more control and authority
> and other concessions, the creditors agreed and consented
> to Debtor's proposed plan and that plan provided for full
> repayment of debts from the revenues of the real estate
> businesses.[32]

On September 17, 2018, Strauss moved to set the motion for turnover back

onto the court's docket, alleging that "[t]o date Mr. Lindemuth has not provided the

Trustee with anything."[33]  At the hearing on that motion in October, the bankruptcy

court reminded Kent's counsel that the court's orders to provide documents and

information remained outstanding.

After receiving a terminal cancer diagnosis, Vikki created the Vikki

Lindemuth Revocable Trust dated November 9, 2018 (the "**Trust**").  The following

year, she filed a "Quit-Claim Deed to Sever Joint Tenancy" (the "**Quitclaim Deed**")

in Shawnee County as to a number of properties that she and Kent owned as joint

tenants.  The Quitclaim Deed transferred Vikki's rights in the properties to herself

---

[31] Hearing Tr. 52:14-23, Feb. 15, 2018, Case No. 12-23060, ECF 201.

[32] Deines Aff. ¶¶ 8-9, Case No. 12-23060, ECF 162-4.

[33] *See* Trustee's Mot. to Immediately Reschedule Trustee's Mot. for Turnover, Case
No. 12-23060, ECF 211.

as a tenant-in-common; its purpose and effect was to sever the joint tenancies and eliminate Kent's rights of survivorship.  Vikki then placed her tenant-in-common interests into the Trust.  Some of the properties have since been sold to third parties, but the rest remain under Lloyd's management.

On January 7, 2019, the bankruptcy court suspended Strauss's appointment as Chapter 11 trustee, administratively terminated the motion for turnover, and ordered Kent to pay general unsecured claims in full by May 6, 2019.[34]

Vikki died on November 11, 2019, while the divorce was still pending and the Lindemuths' individual bankruptcy cases were still open.  The Shawnee County court dismissed the Lindemuths' divorce action the next day without entering a final decree.  On November 13, 2019, Kent's counsel sent Lloyd a letter purporting to terminate the Agent Agreement.[35]

On December 18, 2019, Kent filed two motions against Lloyd and L&M in his individual bankruptcy case, the first seeking damages for alleged violations of the automatic stay and the second seeking a TRO and preliminary injunction.[36]  Both motions related to Lloyd's proposed sale of properties occupied by A&A Mini Storage South and A&A Mini Storage West, two of Kent's non-debtor businesses.  The bankruptcy court denied the motions and held that "although one of the signors of

---

[34] *See* Order Suspending Appt. of Ch. 11 Trustee, Case No. 12-23060, ECF 226.

[35] *See* Letter from Neil Sader to Philip N. Krause & Jim Lloyd (Nov. 13, 2019), ECF 1-11 at 12-13.

[36] *See* Mot. for Damages for Violations of the Automatic Stay, Case No. 12-23060, ECF 349; Debtor's Mot. for TRO and Prelim. Injunctive Relief, Case No. 12-23060, ECF 351.

the Power of Attorney has now died, the Power of Attorney remains in effect and confers to Mr. Lloyd the authority to proceed with transactions as specified therein."[37]

The bankruptcy court ordered Vikki's bankruptcy case closed without discharge on June 16, 2020.[38]

To date, Kent has not complied with the bankruptcy court's orders to cooperate with Lloyd in preparing sworn financial statements and to provide documentation regarding the five unregistered vehicles found on his property. According to Strauss:

> And I don't think—and I would hope Mr. Sader [Lindemuth's current bankruptcy attorney] would not deny telling me that—two things that Mr. Lindemuth was never going to do.  He was never going to sell the firearms and he was never going to provide the financial statements that the court had ordered in its earlier order, that he just told me those were off the table, he is never going to do that, and—and Mr. Sader made a comment whether he thought that was wise or not.  But that's where we came from, and that's why we never reached a resolution.[39]

## II.   **Adversary Proceeding**

Although Lloyd has been a capable and successful steward of the Debtor Companies, Kent's relationship with him has turned adversarial.[40]  On December 7,

---

[37] Order Denying Debtor's Mots., Case No. 12-23060, ECF 407.

[38] *See* Order Closing Case, Case No. 17-20763, ECF 99.

[39] Hearing Tr. 30:7-16, Mar. 14, 2019, Case No. 12-23060, ECF 242.

[40] *See, e.g.*, Mot. for Order Enforcing Ch. 11 Plan Inj. ¶ 48, Case No. 12-23060, ECF 453.  This view is consonant with the bankruptcy court's observations of Kent's behavior, which includes failures to file reports, explain assets discovered by the

2020, Kent's counsel sent Lloyd a letter purporting to terminate the Power of Attorney and "reiterat[ing] his prior termination of the Agent Agreement."[41]

Two months later, Kent filed the seven-count complaint at issue here against Lloyd, L&M, and Shannon Mesker as trustee of the Trust. (Mesker is one of Kent's two daughters.) As against Lloyd and L&M, Kent's complaint alleges that they[42] (1) sold assets belonging to a non-debtor company without authorization (Compl. ¶¶ 42-43, 161); (2) "interfere[d] with [Kent's] ability to access his financial resources to protect his civil and property rights" (*id.* ¶ 48); (3) favored Vikki over Kent in providing information and financial support (*id.* ¶¶ 53-54, 124-25, 149-51); (4) refused Kent's requests for information (*id.* ¶¶ 55-56, 58-60, 131, 145-48);

---

Chapter 11 trustee, and comply with court orders. It is also consonant with the observations of his daughter; according to Mesker's counterclaim against Lindemuth, he:

> has engaged in a concerted effort to interfere with the completion of the Plan and reorganization of the Companies through a series of actions directed primarily at Lloyd and L&M's administration of the Plan, including (but not limited to) . . . stealing auction signs at the site of Company properties that were set for auction in an effort to chill the bidding, resulting in criminal proceedings being brought against Kent . . . , [and] refus[ing] to sign Company tax returns.

ECF 59 ¶ 31.

[41] Letter from Neil Sader to James B. Lloyd & Philip Krause, (Dec. 7, 2020), ECF 1-11 at 2-5.

[42] Neither the complaint nor the motion to dismiss makes much distinction between Lloyd and L&M. However, they are parties to separate agreements (Lloyd, the Power of Attorney; L&M, the Agent Agreement) executed in connection with separate court proceedings (the Power of Attorney is part of the Lindemuths' bankruptcy; the Agent Agreement, their divorce).

(5) "coerced [Kent] to take actions that were not in his best interests" (*id.* ¶ 57); (6) "refused to consult with [Kent] concerning numerous significant management issues regarding the bankruptcy estate" (*id.* ¶ 62); (7) failed to insure two Ford "Super Snake" Mustangs owned by Kent (*id.* ¶¶ 63, 162); (8) failed to secure the White Lakes Mall, a property owned by debtor KDL, Inc. (*id.* ¶¶ 64, 163); (9) failed to notify Kent about pertinent events and expenditures (*id.* ¶¶ 75-76, 86, 92, 95, 104, 126, 128, 152, 154, 157-58, 195); (10) sold Kent's assets and tendered the sale proceeds to creditors in exchange for mortgage releases (*id.* ¶¶ 90-91); (11) failed to take action regarding the Quitclaim Deed (*id.* ¶¶ 96, 159-60, 197); (12) used Debtors' assets to "fund litigation against" Kent (*id.* ¶ 127); (13) took no action to prevent the Trust from liquidating companies it co-owns with Kent (*id.* ¶¶ 155-56); and (14) "conspired" with Vikki and/or the Trust[43] to deprive Kent of his rights of survivorship in the properties affected by the Quitclaim Deed (*id.* ¶¶ 184, 186, 196, 198). As against the Trust, the complaint alleges the conspiracy with Lloyd and L&M regarding Kent's rights of survivorship in the Quitclaim Deed properties (*id.* ¶¶ 184, 186, 196, 198) and also that the Quitclaim Deed was executed and recorded in contempt of the Divorce Court Order (*id.* ¶ 207).

Count I of Kent's complaint, "Declaratory Judgment," seeks a declaration under 28 U.S.C. § 2201 that the Power of Attorney, the Divorce Court Order, and the Agent Agreement are "void, terminated, and of no effect." Count II,

---

[43] Paragraph 184 of Kent's complaint names the Trust as the third co-conspirator, but paragraphs 186 and 198 name Vikki instead, and paragraph 196 names "Vikki Lindemuth and the Trust."

"Accounting," demands that Lloyd and L&M provide an accounting under K.S.A. § 58-662(a)[44] of "receipts, disbursements and transactions" from, to, and on behalf of Kent and his five debtor companies.  Counts III and IV, "Breach of Fiduciary Duty" and "Constructive Fraud," seek damages from Lloyd and L&M under K.S.A. § 58-657(g).[45]  Count V, "Civil Conspiracy," seeks damages from all three defendants for an alleged conspiracy to terminate Kent's rights of survivorship in the properties covered by the Quitclaim Deed.  Count VI, "Declaratory Judgment," seeks a declaration that (a) the Quitclaim Deed is "null and void" and (b) Kent was a joint tenant with right of survivorship in the properties identified therein at the time of Vikki's death.  Count VII, "Quiet Title," seeks a judgment quieting title in Kent's favor as to, and extinguishing the Trust's interest in, those properties identified in the Quitclaim Deed that are still under Lloyd's control.

## III.  <u>Motion to Withdraw the Reference</u>

Federal law grants jurisdiction over bankruptcy cases and bankruptcy-related proceedings to the district courts.  *See* 28 U.S.C. § 1334(a), (b).  It then

---

[44] "The principal may petition the court for an accounting by the principal's attorney in fact or the legal representative of the attorney in fact."  Kan. Stat. Ann. § 58-662(a).

[45] "As between the principal and any attorney in fact or successor, if the attorney in fact or successor undertakes to act, and if in respect to such act, the attorney in fact or successor acts in bad faith, fraudulently or otherwise dishonestly, . . . and thereby causes damage or loss to the principal . . . , such attorney in fact or successor shall be liable to the principal . . . for such damages, together with reasonable attorney fees, and punitive damages as allowed by law."  Kan. Stat. Ann. § 58-657(g).

permits district courts to refer those cases and proceedings to bankruptcy judges, which the District of Kansas has done via standing order. *See* 28 U.S.C. § 157(a); D. Kan. Rule 83.8.5(a) (referencing "Amended Standing Order of Reference" dated June 24, 2013). However, a district court may withdraw that reference as to any case or proceeding, in whole or in part, "for cause." *See* 28 U.S.C. § 157(d); D. Kan. Rule 83.8.6(a)(6). The burden of showing that "cause" exists to withdraw the reference is on the party seeking withdrawal. *See* Hon. Barry Russell, BANKR. EVID. MANUAL § 301:29 (2020) (collecting cases).

Courts in the District of Kansas have found cause to withdraw the reference where a party has timely asserted the right to a jury trial and does not consent to having that jury trial conducted by the bankruptcy court.[46] *See, e.g., Disbursing Agent of the Murray F. Hardesty Estate v. Severson (In re Hardesty)*, 190 B.R. 653,

---

[46] Under 28 U.S.C. § 157(e), "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." Accordingly, D. Kan. Rule 83.8.13 provides:

> (a) A district judge shall conduct jury trials in all bankruptcy cases and proceedings in which a party has a right to trial by jury, a jury is timely demanded, and no statement of consent to jury trial before a bankruptcy judge has been filed.

> (b) A bankruptcy judge shall conduct jury trials in all bankruptcy cases and proceedings in which a party has a right to trial by jury, where a jury is timely demanded, and the parties have jointly or separately filed a statement of consent to trial before a bankruptcy judge. A bankruptcy judge may hear and determine all motions, dispositive or otherwise, filed by the parties in such a case or proceeding.

655 (D. Kan. 1995).  However, "[e]ven where the right to a jury trial constitutes cause for withdrawal, the Court 'may decline to withdraw the reference until the case is ready for trial.'"  *Redmond v. Hassan*, Misc. Action No. 07-204-KHV, 2002 WL 677611, at *1 (D. Kan. Feb. 28, 2007) (quoting *In re Hardesty*, 190 B.R. at 656).

Citing D. Kan Rule "83.8.6(a)(1) and (b)(1),"[47] Kent argues that there are two reasons to withdraw the reference of this case from the bankruptcy court.  First, he argues that his claims are grounded in Kansas law.  Second, he argues that he has requested a jury trial as to three of his seven claims and has not consented to jury trial before a bankruptcy judge.[48]

As to Kent's first argument, D. Kan. Rule 83.8.6(a)(1) allows transfer to the district court where "[i]t is in the interest of justice, in the interest of comity with state courts, or respect for state law that this District Court should abstain from hearing the particular proceeding as is contemplated by 28 U.S.C. § 1334(c)(1)."  This subsection of the local rule is thus about abstention, not withdrawal of the reference, and it is unclear what Kent intends by citing to it.  Having chosen to file this adversary proceeding in federal court, he presumably does not mean to say that neither the bankruptcy court nor the district court ought to actually hear it—but that is precisely what citation to subsection (a)(1) implies.  In any event, "[t]he mere presence of state law issues is not enough to recommend abstention, for virtually

---

[47] The motion likely meant to cite subsection (a)(6) of the local rule, which addresses withdrawal of the reference, rather than subsection (b)(1), which has to do with the timing of a motion for transfer where the movant is an original plaintiff.

[48] *See* ECF 58 ¶¶ 3, 4.

every issue which arises within the context of a bankruptcy case involves state law to at least some degree." *Republic Reader's Serv., Inc. v. Magazine Serv. Bureau, Inc. (In re Republic Reader's Serv., Inc.)* 81 B.R. 422, 426 (Bankr. S.D. Tex. 1987). Here, Kent argues only that his complaint presents state law issues; this argument is not enough to recommend abstention under D. Kan. Rule 83.8.6(a)(1).[49]

As to Kent's second argument, D. Kan. Rule 83.8.6(a)(6)[50] allows transfer to the district court where "[c]ause exists, within the contemplation of 28 U.S.C. § 157(d), for the withdrawal of the particular proceeding to this District Court (a specification of such alleged cause must be stated)." Kent argues that cause to withdraw the reference exists because he has demanded a jury trial as to Counts III, IV, and V of his complaint and does not consent to having it conducted by the bankruptcy court. However, assuming Kent does have the right to a jury trial on those three counts, one crucial fact distinguishes this matter from the cases he cites.

That distinguishing fact is that the Joint Plans—*which Kent proposed*—provide that the bankruptcy court shall have *exclusive jurisdiction* over all matters arising out of, or related to, Debtors' Chapter 11 cases and the Joint Plans.[51] *See*

---

[49] To the extent Kent is arguing that his complaint includes so-called *Stern* claims, *see Stern v. Marshall*, 564 U.S. 462 (2011); *Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*, 792 F.3d 1274 (10th Cir. 2015), a bankruptcy court may finally adjudicate *Stern* claims with the parties' consent. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

[50] *See supra* note 47.

[51] Of course, a confirmation order cannot expand the bankruptcy court's jurisdiction beyond that which already exists. "The general rule appears to be that, with some minor exceptions, the postconfirmation jurisdiction of the bankruptcy court may not exceed the lesser of (1) the extent of the grant contained in the plan, and (2) the extent of jurisdiction permitted under the Third Circuit's *Pacor* decision." 1 *Collier*

page 4 *supra* (quoting Joint Plans, Art. XII).  By arguing that his claims against Lloyd (which claims arise out of and are related to Debtors' Chapter 11 cases and the Joint Plans) should not be tried in bankruptcy court, Kent is proposing to modify the Joint Plans.  However, such modification is impermissible under the Bankruptcy Code.

Chapter 11 plan modifications are governed by 11 U.S.C. § 1127.  Section 1127(b) allows modification before substantial consummation of the plan; § 1127(e) allows modification after substantial consummation of the plan in an individual Chapter 11 case, but only in a limited and enumerated number of ways.  Here, § 1127(b) does not apply because the Joint Plans have been substantially consummated;[52] § 1127(e) does apply, but does not include the jurisdiction-related modification Kent now proposes.  To permit Kent to rescind his prior consent to bankruptcy-court jurisdiction over this proceeding would thus be an impermissible modification of the Joint Plans under § 1127.  And there are a number of reasons why the Joint Plans themselves cannot now be subjected to collateral attack.[53]

---

*on Bankruptcy* ¶ 3.02[7] (Richard Levin & Henry J. Sommer eds., 16th ed. 2020) (referencing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  But the point here is that if the bankruptcy court *does* have statutory jurisdiction over this action (which, according to paragraph 4 of the complaint, it does), then the Joint Plans provide that such jurisdiction is exclusive.

[52] *See* Final Decree, Case No. 12-23055, ECF 690 ("[T]he Reorganized Debtor's Plan has been substantially consummated as contemplated by 11 U.S.C. § 1101(2).").

[53] *See, e.g.*, 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind the debtor."); *J.D. Behles & Assocs. v. Raft (In re K.D. Co.)*, 254 B.R. 480, 490 (B.A.P. 10th Cir. 2000) ("A confirmation order is a final judgment in the case, and neither it nor the plan that it confirms may be attacked other than by filing a timely appeal."); *cf. United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010).

The burden is on Kent to show that cause exists to withdraw the reference. Weighing Kent's current assertion of a right to a district-court jury trial against the Joint Plans' provision to the contrary (which, under § 1127, can no longer be modified), the bankruptcy court does not find that Kent has met his burden at this time. Because Kent has not met his burden of establishing cause, this court recommends that his motion to withdraw the reference be denied.

Alternatively, if the district court finds that Kent's current assertion of a right to jury trial does establish cause for withdrawal, the district court "may decline to withdraw the reference until the case is ready for trial." *See Hassan*, 2007 WL 677611, at *1 (quoting *In re Hardesty*, 190 B.R. at 656). "Such an approach streamlines pretrial procedure and serves the interests of judicial efficiency by taking advantage of the Bankruptcy Court's expertise and familiarity of the issues and discouraging forum shopping." *Id.*; *see also Parks v. Persels & Assocs., L.L.C.*, No. 11-111-JTM, 2011 WL 1752161, at *1 (D. Kan. May 9, 2011). A court might reasonably conclude, given Kent's previous (unsuccessful) attempts to challenge Lloyd's actions[54] and the unusual posture of this case, that forum-shopping plays a part in his motion. In light of that danger, and in light of this bankruptcy court's years of familiarity with the parties and issues, the bankruptcy court recommends that if the district court finds that Kent has established cause for withdrawal, it should decline to withdraw the reference until the case is ready for trial.

---

[54] *See supra* notes 35-37, 40-41 and accompanying text.

###